# MOREHEAD, WARDEN, *v.* NEW YORK EX REL. TIPALDO.

No. 838.   Argued April 28, 29, 1936.—Decided June 1, 1936.

588

*Mr. Henry Epstein,* Solicitor General of New York, with whom *Mr. John J. Bennett, Jr.,* Attorney General, and *Mr. John F. X. McGohey,* Assistant Attorney General, were on the brief, for petitioner.

590

*Messrs. Arthur Levitt* and *Nathan L. Miller,* with whom *Messrs. Harold Allen Gates* and *Challen B. Ellis* were on the brief, for Tipaldo.

596

598

By leave of Court, *Mr. Dean G. Acheson* argued the case on behalf of the States of Connecticut, Illinois, Massachusetts, New Hampshire, New Jersey, and Rhode Island, as *amici curiae,* in support of the statute. With him on the brief were *Mr. Edward J. Daly,* Attorney General of Connecticut; *Mr. Otto Kerner,* Attorney General of Illinois; *Mr. Paul A. Dever,* Attorney General of Massachusetts; *Mr. David T. Wilentz,* Attorney General of New Jersey; *Mr. Francis U. Johnston,* Attorney General of New Hampshire; and *Mr. John P. Hartigan,* Attorney General of Rhode Island.

*Mr. John W. Bricker,* Attorney General, *Messrs. Isadore Topper* and *John K. Evans,* Assistant Attorneys General, and *Messrs. William S. Evatt* and *Marvin C. Harrison,* on behalf of the State of Ohio; and *Messrs. Paul Windels, Paxton Blair,* and *Paul J. Kern,* on behalf of the City of New York, supporting the statute.

*Mr. Charles J. Campbell,* on behalf of the New York State Hotel Assn.; and *Burnita Shelton Matthews* and *Rebekah Scandrett Greathouse,* on behalf of the National Women's Party et al., challenging the statute.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This is a habeas corpus case originating in the supreme Court of New York. Relator was indicted in the county court of Kings county and sent to jail to await trial upon the charge that as manager of a laundry he failed to obey the mandatory order of the state industrial commissioner prescribing minimum wages for women employees.

The relator's petition for the writ avers that the statute, c. 584 of the Laws of 1933 (Cons. Law, c. 31, art. 19) under which the commissioner made the order, insofar as it purports to authorize him to fix women's wages, is repugnant to the due process clause, Art. I, § 6, of the constitution of the State and the due process clause of the Fourteenth Amendment to the Constitution of the United States. The application for the writ is grounded upon the claim that the state statute is substantially identical with the minimum wage law enacted by Congress for the District of Columbia, 40 Stat. 960, which in 1923 was condemned by this court as repugnant to the due process clause of the Fifth Amendment. *Adkins* v. *Children's Hospital*, 261 U. S. 525.

The warden's return, without disclosing the commissioner's order, the prescribed wages, the findings essential to his jurisdiction to establish them, things done in pursuance of the Act, or the allegations of the indictment, merely shows that under an order of the county court he was detaining relator for trial. The case was submitted on petition and return. The court dismissed the writ. 156 Misc. 522; 282 N. Y, S. 576. Relator took the case to the Court of Appeals. It held the Act repugnant to the due process clauses of the state and federal constitutions. 270 N. Y. 233; 200 N. E. 799. The remittitur directed that the order appealed from be reversed, the writ sustained and the prisoner discharged; it certified that the federal constitutional question was presented and necessarily passed on. The supreme court entered judgment as directed. We granted a writ of certiorari.

The Act extends to women and minors in any "occupation" which "shall mean an industry, trade or business or branch thereof or class of work therein in which women or minors are gainfully employed, but shall not include domestic service in the home of the employer or labor

on a farm." § 551 (6). It is not an emergency law. It does not regulate hours or any conditions affecting safety or protection of employees. It relates only to wages of adult women and minors. As the record is barren of details in respect of investigation, findings, amounts being paid women workers in laundries or elsewhere prior to the order, or of things done to ascertain the minimum prescribed, we must take it as granted that, if the State is permitted as against employers and their women employees to establish and enforce minimum wages, that power has been validly exerted. It is to be assumed that the rates have been fairly made in accordance with the procedure prescribed by the Act and in full compliance with the defined standards. If, consistently with the due process clause, the State may not enter upon regulation of the sort undertaken by the challenged enactment, then plainly it cannot by diligence to insure the establishment of just minima create power to enter that field. Cf. *St. Joseph Stock Yards Co.* v. *United States, ante,* p. 38; *Baltimore & Ohio R. Co.* v. *United States, ante,* p. 349.

The *Adkins* case, unless distinguishable, requires affirmance of the judgment below. The petition for the writ sought review upon the ground that this case is distinguishable from that one. No application has been made for reconsideration of the constitutional question there decided.[1] The validity of the principles upon which that decision rests is not challenged. This court confines itself to the ground upon which the writ was

---

[1] Briefs of *amici curiae* in support of the application were filed by the City of New York and the State of Illinois. Briefs on the merits supporting the New York Act, were filed by the State of Ohio, and by the States of Connecticut, Illinois, Massachusetts, New Hampshire, New Jersey and Rhode Island. Briefs for affirmance were filed by the New York State Hotel Association, National Woman's Party, National Association of Women Lawyers, et al.

asked or granted. *Alice State Bank* v. *Houston Pasture Co.*, 247 U. S. 240, 242. *Clark* v. *Williard*, 294 U. S. 211, 216. Here the review granted was no broader than that sought by the petitioner. *Johnson* v. *Manhattan Ry. Co.*, 289 U. S. 479, 494. He is not entitled and does not ask to be heard upon the question whether the *Adkins* case should be overruled. He maintains that it may be distinguished on the ground that the statutes are vitally dissimilar.

The District of Columbia Act provided for a board to ascertain and declare "standards of minimum wages" for women in any occupation and what wages were "inadequate to supply the necessary cost of living to any such women workers to maintain them in good health and to protect their morals." § 9. Violations were punishable by fine and imprisonment. § 18. The declared purposes were to protect women from conditions detrimental to their health and morals, resulting from wages inadequate to maintain decent standards of living. § 23.

The New York Act declares it to be against public policy for any employer to employ any woman at an oppressive and unreasonable wage (§ 552) defined as one which is "both less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health." § 551 (7). "A fair wage" is one "fairly and reasonably commensurate with the value of the service or class of service rendered." § 551 (8). If the commissioner is of opinion that any substantial number of women in any occupation are receiving oppressive and unreasonable wages he shall appoint a wage board to report upon the establishment of minimum fair wage rates. § 554. After investigation, the board shall submit a report including its recommendations as to minimum fair wage standards. § 555.

And for administrative guidance, the Act declares: "In establishing a minimum fair wage for any service or class

of service under this article the commissioner and the wage board without being bound by any technical rules of evidence or procedure (1) may take into account all relevant circumstances affecting the value of the service or class of service rendered, and (2) may be guided by like considerations as would guide a court in a suit for the reasonable value of services rendered where services are rendered at the request of an employer without contract as to the amount of the wage to be paid, and (3) may consider the wages paid in the state for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards." § 551 (8).

If the commissioner accepts the report, he shall publish it and a public hearing must be held. § 556. If after the hearing he approves the report, he "shall make a directory order which shall define minimum fair wage rates." § 557. Upon hearing and finding of disobedience the commissioner may publish the name of an employer as having failed to observe the directory order. § 559. If, after a directory order has been in effect for nine months, the commissioner is of opinion that persistent non-observance is a threat to the maintenance of the prescribed standards, he may after hearing make the order mandatory. § 560. Violation of a mandatory order is a misdemeanor punishable by fine, imprisonment or both. § 565 (2).

Thus it appears: The minimum wage provided for in the District Act was one not less than adequate "to supply the necessary cost of living to any such women workers to maintain them in good health and to protect their morals." The New York Act defines an oppressive and unreasonable wage as containing two elements. The one first mentioned is: "less than the fair and reasonable value of the services rendered." The other is: "less than sufficient to meet the minimum cost of living necessary for health." The basis last mentioned is not to be distin-

guished from the living wage defined in the District act. The exertion of the granted power to prescribe minimum wages is by the State act conditioned upon a finding by the commissioner or other administrative agency that a substantial number of women in any occupation are receiving wages that are oppressive and unreasonable, i. e., less than value of the service and less than a living wage. That finding is essential to jurisdiction of the commissioner. In the state court there was controversy between the parties as to whether the "minimum fair wage rates" are required to be established solely upon value of service or upon that value and the living wage. Against the contention of the attorney general, the Court of Appeals held that the minimum wage must be based on both elements.

Speaking through its chief judge, that court said: "We find no material difference between the act of Congress and this act of the New York State Legislature. The act of Congress, it is said, was to protect women from conditions resulting from wages which were inadequate to maintain decent standards of living." The opinion then quotes from the brief of the attorney general: " 'The purpose of the statute in the *Adkins* case was to guarantee a wage based solely upon the necessities of the workers. The statute did not provide for the wages to have any relationship to earning power; was applicable to all vocations and not to the character of the work . . . As contrasted with this statute, the New York Minimum Wage Law provides a definite standard for wages paid. It provides that the worker is to be paid at least the value of the services rendered.' " The opinion continues: "This is a difference in phraseology and not in principle. The New York act, as above stated, prohibits an oppressive and unreasonable wage, which means *both* less than the fair and reasonable value of the services rendered *and*

less than sufficient to meet the minimum cost of living necessary for health. The act of Congress had one standard, the living wage; this State act has added another, reasonable value. The minimum wage must include both. What was vague before has not been made any clearer. One of the elements, therefore, in fixing the fair wage is the very matter which was the basis of the congressional act. Forcing the payment of wages at a reasonable value does not make inapplicable the principle and ruling of the *Adkins* case. The distinctions between this case and the *Adkins* case are differences in details, methods and time; the exercise of legislative power to fix wages in any employment is the same."

The petitioner does not suggest and reasonably it cannot be thought that, so far as concerns repugnancy to the due process clause, there is any difference between the minimum wage law for the District of Columbia and the clause of the New York Act, "less than sufficient to meet the minimum cost of living necessary for health." Petitioner does not claim that element was validated by including with it the other ingredient, "less than the fair and reasonable value of the services rendered."

His brief repeats the state court's declaration: "'The act of Congress had one standard, the living wage; this State act has added another, reasonable value. *The minimum wage must include both.* What was vague before has not been made any clearer. *One of the elements, therefore, in fixing the fair wage is the very matter which was the basis of the congressional act.*'" Then he says: "The italicized lines carry the Court's misconception of the statute. It is a basic misconception. From it flows the erroneous conclusion of the Court of Appeals that there exists no material difference between the two statutes . . . Those two factors *do not* enter into the determination of the minimum *'fair wage'* as in the statute defined, nor as determined in this case. The only basis for

evaluating and arriving at the 'fair minimum wage' is the fair value of the services rendered."

There is no blinking the fact that the state court construed the prescribed standard to include cost of living or that petitioner here refuses to accept that construction. Petitioner's contention that the Court of Appeals misconstrued the Act cannot be entertained. This court is without power to put a different construction upon the state enactment from that adopted by the highest court of the State. We are not at liberty to consider petitioner's argument based on the construction repudiated by that court. The meaning of the statute as fixed by its decision must be accepted here as if the meaning had been specifically expressed in the enactment. *Knights of Pythias* v. *Meyer,* 265 U. S. 30, 32. Exclusive authority to enact carries with it final authority to say what the measure means. *Jones* v. *Prairie Oil Co.,* 273 U. S. 195, 200. The standard of "minimum fair wage rates" for women workers to be prescribed must be considered as if both elements—value of service and living wage—were embodied in the statutory definition itself. *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 220. As our construction of an Act of Congress must be deemed by state courts to be the law of the United States, so this New York Act as construed by her court of last resort, must here be taken to express the intention and purpose of her lawmakers. *Green* v. *Neal's Lessee,* 6 Pet. 291, 295–298.

The state court rightly held that the *Adkins* case controls this one and requires that relator be discharged upon the ground that the legislation under which he was indicted and imprisoned is repugnant to the due process clause of the Fourteenth Amendment.

The general statement in the New York Act of the fields of labor it includes, taken in connection with the work not covered, indicates legislative intention to reach

nearly all private employers of women. The Act does not extend to men. It does extend to boys and girls under the age of 21 years but there is here involved no question as to its validity in respect of wages to be prescribed for them. Relator's petition for the writ shows that the charge against him is that as manager of a laundry he "disobeyed a mandatory order prescribing certain minimum wages for certain adult women employees of the said laundry." The rights of no other class of workers are here involved.

Upon the face of the act the question arises whether the State may impose upon the employers state-made minimum wage rates for all competent experienced women workers whom they may have in their service. That question involves another one. It is: Whether the State has power similarly to subject to state-made wages all adult women employed in trade, industry or business, other than house and farm work. These were the questions decided in the *Adkins* case. So far at least as concerns the validity of the enactment under consideration, the restraint imposed by the due process clause of the Fourteenth Amendment upon legislative power of the State is the same as that imposed by the corresponding provision of the Fifth Amendment upon the legislative power of the United States.

This court's opinion shows (pp. 545, 546): The right to make contracts about one's affairs is a part of the liberty protected by the due process clause. Within this liberty are provisions of contracts between employer and employee fixing the wages to be paid. In making contracts of employment, generally speaking, the parties have equal right to obtain from each other the best terms they can by private bargaining. Legislative abridgement of that freedom can only be justified by the existence of exceptional circumstances. Freedom of contract is the

general rule and restraint the exception. This court has found not repugnant to the due process clause statutes fixing rates and charges to be exacted by businesses impressed with a public interest, relating to contracts for the performance of public work, prescribing the character, methods and time of payment of wages, fixing hours of labor. Physical differences between men and women must be recognized in proper cases and legislation fixing hours or conditions of work may properly take them into account, but (p. 553) "we cannot accept the doctrine that women of mature age, *sui juris*, require or may be subjected to restrictions upon their liberty of contract which could not lawfully be imposed in the case of men under similar circumstances. To do so would be to ignore all the implications to be drawn from the present day trend of legislation, as well as that of common thought and usage, by which woman is accorded emancipation from the old doctrine that she must be given special protection or be subjected to special restraint in her contractual and civil relationships. . . . [p. 554] Enough has been said to show that the authority to fix hours of labor cannot be exercised except in respect of those occupations where work of long continued duration is detrimental to health. This Court has been careful in every case where the question has been raised, to place its decision upon this limited authority of the legislature to regulate hours of labor and to disclaim any purpose to uphold the legislation as fixing wages, thus recognizing an essential difference between the two. It seems plain that these decisions afford no real support for any form of law establishing minimum wages."

The decision and the reasoning upon which it rests clearly show that the State is without power by any form of legislation to prohibit, change or nullify contracts between employers and adult women workers as to the amount of wages to be paid.

Then, the opinion emphasizes objections specifically applicable to the requirement that the minimum wages to be prescribed under the District Act shall be adequate "to supply the necessary cost of living to any such women workers to maintain them in good health and to protect their morals." Some of them were: The price fixed by the board need have no relation to earning powers, hours or place or character of work; it is based wholly on opinion of the board as to what amount will be necessary to comply with the standard; it applies to every occupation without regard to the kind of work; the standard is so vague as to be impossible of practical application; the Act takes account of the necessities of only the employee; to the extent that the sum fixed exceeds fair value of service rendered, it amounts to a compulsory exaction for the support of a partially indigent person for whose condition there rests upon the employer no peculiar responsibility; the statute exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business or the contract or the work the employee engages to do; the declared basis is not the value of the service rendered but the extraneous circumstance that the employee needs to get a prescribed sum of money to insure her subsistence, health and morals. The court said (p. 558): "The ethical right of every worker, man or woman, to a living wage may be conceded. . . . The fallacy of the proposed method of attaining it is that it assumes that every employer is bound at all events to furnish it. The moral requirement, implicit in every contract of employment, viz., that the amount to be paid and the service to be rendered shall bear to each other some relation of just equivalence, is completely ignored. The necessities of the employee are alone considered and these arise outside of the employment and are as great in one occupation as in another."

Illustrating particular constitutional difficulties encountered by the enactment then before us, the opinion proceeds (p. 559): "Should a statute undertake to vest in a commission power to determine the quantity of food necessary for individual support and require the shopkeeper, if he sell to the individual at all, to furnish that quantity at not more than a fixed maximum, it would undoubtedly fall before the constitutional test. The fallacy of any argument in support of the validity of such a statute would be quickly exposed. The argument in support of that now being considered is equally fallacious, though the weakness of it may not be so plain. A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, to pay the value of the services rendered, even to pay with fair relation to the extent of the benefit obtained from the service, would be understandable. But a statute which prescribes payment without regard to any of these things, and solely with relation to circumstances apart from the contract of employment, the business affected by it and the work done under it, is so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States."

Petitioner does not attempt to support the Act as construed by the state court. His claim is that it is to be tested here as if it did not include the cost of living and as if value of service were the sole standard. Plainly that position is untenable. If the State has power to single out for regulation the amount of wages to be paid women, the value of their services would be a material consideration. But that fact has no relevancy upon the question whether the State has any such power. And utterly without significance upon the question of power is the suggestion that the New York prescribed standard includes value of service with cost of living whereas the District of Columbia standard was based upon the latter

alone. As shown above, the dominant issue in the *Adkins* case was whether Congress had power to establish minimum wages for adult women workers in the District of Columbia. The opinion directly answers in the negative. The ruling that defects in the prescribed standard stamped that Act as arbitrary and invalid was an additional ground of subordinate consequence.

The dissenting opinion of Mr. Chief Justice Taft (in which Mr. Justice Sanford concurred) assumes (p. 564) "that the conclusion in this [*Adkins*] case rests on the distinction between a minimum of wages and a maximum of hours." That is the only point he discussed; he did not refer to the validity of the standard prescribed by the Act. The dissenting opinion of Mr. Justice Holmes begins (p. 567): "The question in this case is the broad one, Whether Congress can establish minimum rates of wages for women in the District of Columbia with due provision for special circumstances, or whether we must say that Congress has no power to meddle with the matter at all." And, after assuming that women would not be employed at the wages fixed unless they were earned or unless the employer could pay them, the opinion says (p. 570): "But the ground on which the law is held to fail is fundamental and therefore it is unnecessary to consider matters of detail." If the decision of the court turned upon the question of the validity of the particular standard, that question could not have been ignored by the justices who were in favor of upholding the Act. Clearly they understood—and rightly—that, by the opinion of the court, it was held that Congress was without power to deal with the subject at all.

To distinguish this from the *Adkins* case, petitioner refers to changes in conditions that have come since that decision, cites great increase during recent years in the number of women wage earners and invokes the first section of the Act, called "Factual background."

The Act is not to meet an emergency; it discloses a permanent policy; the increasing number of women workers suggests that more and more they are getting and holding jobs that otherwise would belong to men. The "Factual background" must be read in the light of the circumstances attending its enactment. The New York legislature passed two minimum wage measures and contemporaneously submitted them to the governor. One was approved; it is the Act now before us. The other was vetoed and did not become law. They contained the same definitions of oppressive wage and fair wage and in general provided the same machinery and procedure culminating in fixing minimum wages by directory orders. The one vetoed was for an emergency; it extended to men as well as to women employees; it did not provide for the enforcement of wages by mandatory orders.

It is significant that their "factual backgrounds" are much alike. They are indicated in the margin.[2] These

---

[2] Omitting the words in brackets, the following is the factual background in the first section of the Act before us. Adding the words in brackets and omitting those in italics, there is indicated the background in the bill that was not approved.

"The employment of [men and] women and minors in trade and industry in the state of New York at wages unreasonably low and not fairly commensurate with the value of the services rendered is a matter of grave and vital public concern. Many [men and] women and minors employed for gain in the state of New York are not as a class upon a level of equality in bargaining with their employers in regard to minimum fair wage standards, and 'freedom of contract' as applied to their relations with their employers is illusory. Since a very large percentage of such workers are obliged from their week to week wages to support themselves and others who are dependent upon them in whole or in part they are, by reason of their necessitous circumstances, forced to accept whatever wages are offerd to them. Judged by any reasonable standard, wages are in many cases fixed by chance and caprice and the wages accepted are often found to bear no relation to the fair value of the service rendered. *Women and minors employed for gain are peculiarly subject to the over-*

legislative declarations, in form of findings or recitals of fact, serve well to illustrate why any measure that deprives employers and adult women of freedom to agree upon wages, leaving employers and men employees free so to do, is necessarily arbitrary. Much, if not all, that in them is said in justification of the regulations that the Act imposes in respect of women's wages applies with equal force in support of the same regulation of men's, wages. While men are left free to fix their wages by agreement with employers, it would be fanciful to suppose that the regulation of women's wages would be useful to prevent or lessen the evils listed in the first section of the Act. Men in need of work are as likely as women to accept the low wages offered by unscrupulous employers. Men in greater number than women support themselves and dependents and because of need will work for whatever wages they can get and that without regard to the value of the service and even though the pay is less than minima prescribed in accordance with this Act. It is plain that, under circumstances such as those por-

reaching of inefficient, harsh or ignorant employers and under unregulated competition where no adequate machinery exists for the effective regulation and maintenance of minimum fair wage standards, [and] the standards such as exist tend to be set by the least conscionable employers. In the absence of any effective minimum fair wage rates for women and minors, the constant lowering of wages by unscrupulous employers constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers [a large proportion of the population of the state] and threatens the stability of industry. The evils of oppressive, unreasonable and unfair wages as they affect women and minors employed in the state of New York are such as to render imperative the exercise of the police power of the state for the protection of industry and of the [men and] women and minors employed therein and of the public interest of the community at large in their health and well-being and in the prevention of the deterioration of the race. In the considered judgment of the legislature this article is constitutional."

trayed in the "Factual background," prescribing of minimum wages for women alone would unreasonably restrain them in competition with men and tend arbitrarily to deprive them of employment and a fair chance to find work.

This court, on the authority of the *Adkins* case and with the acquiescence of all the justices who dissented from the decision,[3] held repugnant to the due process clause of the Fourteenth Amendment statutes of Arizona and Arkansas,[4] respectively, fixing minimum wages for women. *Murphy* v. *Sardell*, 269 U. S. 530. *Donham* v. *West-Nelson Mfg. Co.*, 273 U. S. 657. We have adhered to the principle there applied and cited it as a guide in other cases. *Meyer* v. *Nebraska*, 262 U. S. 390, 399. *Wolff Packing Co.* v. *Industrial Court*, 262 U. S. 522, 534. *Ribnik* v. *McBride*, 277 U. S. 350, 356. See *Near* v. *Minnesota*, 283 U. S. 697, 707-708. States having similar enactments have construed it to prevent the fixing of wages for adult women. *Topeka Laundry Co.* v. *Court of In-*

---

[3] Mr. Justice Brandeis took no part in the consideration of the *Adkins* case. He noted dissent without more in the Arizona case and Arkansas case.

[4] The Arizona Act declared: "No person . . . shall employ any female in any store, office, shop, restaurant, dining room, hotel, rooming house, laundry or manufacturing establishment at a weekly wage of less than Sixteen Dollars ($16.00) per week; a lesser amount being hereby declared inadequate to supply the necessary cost of living to any such female, to maintain her health, and to provide her with the common necessaries of life." Laws of Arizona, 1923, c. 3, § 1.

The Arkansas Act declared: "It shall be unlawful for any employer . . . to pay any female worker in any establishment or occupation less than the wage specified in this section, to-wit, except as hereinafter provided: "All female workers who have had six months' practicable experience in any line of industry or labor shall be paid not less than one dollar and twenty-five cents per day. The minimum wage for inexperienced female workers who have not had six months experience in any line of industry or labor shall be paid not less than one dollar per day." § 7108, Crawford & Moses Digest.

*dustrial Relations,* 119 Kan. 12; 237 Pac. 1041. *Stevenson* v. *St. Clair,* 161 Minn. 444; 201 N. W. 629. See *Folding Furniture Works* v. *Industrial Commission,* 300 Fed. 991. *Peoplc* v. *Successors of Laurnaga & Co.,* 32 P. R. 766.

The New York court's decision conforms to ours in the *Adkins* case, and the later rulings that we have made on the authority of that case. That decision was deliberately made upon careful consideration of the oral arguments and briefs of the respective parties and also of briefs submitted on behalf of States and others as amici curiae. In the Arizona case the attorney general sought to distinguish the District of Columbia Act from the legislation then before us and insisted that the latter was a valid exertion of the police power of the State. Counsel for the California commission submitted a brief amicus curiae in which he elaborately argued that our decision in the *Adkins* case was erroneous and ought to be overruled. In the Arkansas case the state officers, appellants there, by painstaking and thorough brief presented arguments in favor of the same contention. But this court, after thoughtful attention to all that was suggested against that decision, adhered to it as sound. And in each case, being clearly of opinion that no discussion was required to show that, having regard to the principles applied in the *Adkins* case, the state legislation fixing wages for women was repugnant to the due process clause of the Fourteenth Amendment, we so held and upon the authority of that case affirmed per curiam the decree enjoining its enforcement. It is equally plain that the judgment in the case now before us must also be

*Affirmed.*

MR. CHIEF JUSTICE HUGHES, dissenting.

I am unable to concur in the opinion in this case. In view of the difference between the statutes involved, I

cannot agree that the case should be regarded as controlled by *Adkins* v. *Children's Hospital,* 261 U. S. 525. And I can find nothing in the Federal Constitution which denies to the State the power to protect women from being exploited by overreaching employers through the refusal of a fair wage as defined in the New York statute and ascertained in a reasonable manner by competent authority.

*First.*—Relator in his petition for *habeas corpus* raises no question as to the fairness of the minimum wage he was required to pay. He does not challenge the regularity of the proceedings by which the amount of that wage was determined. We must assume that none of the safeguards of the statute was ignored and that its provisions for careful and deliberate procedure were followed in all respects. It is important at the outset to note the requirements of that procedure, as they at once dispose of any question of arbitrary procedural action.

The statute states its objectives. It defines an "oppressive and unreasonable wage" as one which "is both less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health." It defines a "fair wage" as one "fairly and reasonably commensurate with the value of the service or class of service rendered." It relates to an industry, trade or business, other than domestic service or labor on a farm. The industrial commissioner is authorized to investigate and ascertain the wages of women and minors. If he is of the opinion that any substantial number of women or minors are receiving "oppressive and unreasonable" wages, he must appoint a wage board to make report. That board is to be composed of not more than three representatives of employers, an equal number of representatives of employees, and not more than three disinterested persons representing the public. The wage board is fully equipped with

authority to conduct a comprehensive investigation. It may differentiate and classify employments in any occupation according to the nature of the service rendered. It may recommend minimum fair wage rates varying with localities. It may recommend a suitable scale of rates for learners and apprentices which may be less than those recommended for experienced women or minor workers. The wage board may take into account all relevant circumstances affecting the value of the service or class of service. It may be guided by such considerations as would guide a court in a suit for the reasonable value of services rendered. It may consider the wages paid in the State for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards.

The commissioner may approve or disapprove the report of the wage board. If the commissioner disapproves, he may resubmit the matter to the same or a new board. In case the report is approved, the commissioner is to make a "directory order" which defines minimum "fair wage rates" and is to include appropriate administrative regulations. The latter may embrace regulations governing learners, apprentices, piece rates or their relation to time rates, overtime or part-time rates, bonuses or special pay for special or extra work, deductions for board, lodging and other items or services supplied by the employer, and other special conditions. Special licenses, authorizing employment at lower rates, may be issued to a woman or minor whose earning capacity is impaired by age or physical or mental deficiency or injury.

If the commissioner has reason to believe that an employer is not observing the provisions of the "directory order," he may, upon notice, summon the employer to show cause why his name should not be published as having failed to comply with the order. And, after hearing and in case of a finding of non-observance, the com-

missioner may cause the name of the employer to be published. After a "directory minimum fair wage order" has been in effect for nine months, if it appears that there has been persistent non-observance, notice may be given of the intention to make the order mandatory and of a public hearing at which all persons in favor of, or opposed to, such a mandatory order may be heard. And it is after such hearing that the commissioner may make the previous directory order or any part of it mandatory and publish it accordingly.

It is disobedience to such a mandatory order which is punished by fine or by imprisonment. It is the violation of such an order, made after the inquiries, report, the tentative order, and the hearings which the statute enjoins, that is the basis of the prosecution in the case at bar.

*Second.*—In reaching its conclusion, the state court construed the opinion in the *Adkins* case and deemed that ruling applicable here. That, however, is a construction of the decision of this Court. That construction is not binding upon us.

When the opinion of the state court is examined in order to ascertain what construction was placed upon the statute, we find little more than a recital of its provisions. The state court says: "The New York act, as above stated, prohibits an oppressive and unreasonable wage, which means *both* less than the fair and reasonable value of the services rendered *and* less than sufficient to meet the minimum cost of living necessary for health." This is a repetition of the words of the statute in subdivision 7 of § 551 defining an "oppressive and unreasonable wage." The court adds: "The act of Congress [in the *Adkins* case] had one standard, the living wage; this State act has added another, reasonable value. The minimum wage must include both. What was vague before has not been made any clearer. One of the elements,

therefore, in fixing the fair wage is the very matter which was the basis of the congressional act." But the court expressly recognizes that a wage is not denounced by the New York act as "oppresive and unreasonable" unless it is less than the fair and reasonable value of the services rendered. The statute also provides in explicit terms that the "fair wage" which is to be prescribed is one that is "fairly and reasonably commensurate with the value of the service or class of service rendered." I find nothing in the opinion of the state court which can be taken to mean that this definite provision of the statute is not obligatory upon the authorities fixing a fair wage. Certainly, the court has not said so, and I think that we must assume that the standard thus described is set up by the New York act. And there is no suggestion that the "fair wage" as prescribed in the instant case was not commensurate with the reasonable value of the service rendered by the employees.

When the opinion of the state court goes beyond the statement of the provisions of the act, and says that the setting up of such a standard does not create a material distinction when compared with the Act of Congress in the *Adkins* case, the state court is not construing the state statute. It is passing upon the effect of the difference between the two acts from the standpoint of the Federal Constitution. It is putting aside an admitted difference as not controlling. It is holding, as the state court says, that "Forcing the payment of wages at a reasonable value does not make inapplicable the principle and ruling of the *Adkins* case."

That, it seems to me, is clearly a federal and not a state question, and I pass to its consideration.

*Third.*—The constitutional validity of a minimum wage statute like the New York act has not heretofore been passed upon by this Court. As I have said, the required correspondence of the prescribed "fair wage" to

the reasonable value of the service which the employee performs stands out as an essential feature of the statutory plan. The statute for the District of Columbia which was before us in the *Adkins* case did not have that feature. That statute provided for a minimum wage adequate "to supply the necessary cost of living to women workers" and "to maintain them in health and to protect their morals." 40 Stat. 963. The standard thus set up did not take account of the reasonable value of the service rendered. As this Court said, it compelled the employer "to pay at least the sum fixed in any event, because the employee needs it, but requires no service of equivalent value from the employee." In the cases of *Murphy* v. *Sardell,* 269 U. S. 530, and *Donham* v. *West-Nelson Co.,* 273 U. S. 657, the statutes of Arizona and Arkansas, respectively, were of a similar character, and both these cases were decided upon the authority of the *Adkins* case. New York and other States have been careful to adopt a different and improved standard, in order to meet the objection aimed at the earlier statutes, by requiring a fair equivalence of wage and service.

That the difference is a material one, I think is shown by the opinion in the *Adkins* case. That opinion contained a broad discussion of state power, but it singled out as an adequate ground for the finding of invalidity that the statute gave no regard to the situation of the employer and to the reasonable value of the service for which the wage was paid. Upon this point the Court said (261 U. S. pp. 558, 559):

"The feature of this statute which, perhaps more than any other, puts upon it the stamp of invalidity is that it exacts from the employer an arbitrary payment for a purpose and upon a basis having no causal connection with his business, or the contract or the work the employee engages to do. The declared basis, as already

pointed out, is not the value of the service rendered, but the extraneous circumstance that the employee needs to get a prescribed sum of money to insure her subsistence, health and morals. The ethical right of every worker, man or woman, to a living wage may be conceded. One of the declared and important purposes of trade organizations is to secure it. And with that principle and with every legitimate effort to realize it in fact, no one can quarrel; but the fallacy of the proposed method of attaining it is that it assumes that every employer is bound at all events to furnish it. The moral requirement implicit in every contract of employment, viz, that the amount to be paid and the service to be rendered shall bear to each other some relation of just equivalence, is completely ignored. . . . A statute requiring an employer to pay in money, to pay at prescribed and regular intervals, to pay the value of the services rendered, even to pay with fair relation to the extent of the benefit obtained from the service, would be understandable. But a statute which prescribes payment without regard to any of these things and solely with relation to circumstances apart from the contract of employment, the business affected by it and the work done under it, is so clearly the product of a naked, arbitrary exercise of power that it cannot be allowed to stand under the Constitution of the United States."

As the New York act is free of that feature, so strongly denounced, the question comes before us in a new aspect. The Court was closely divided in the *Adkins* case, and that decision followed an equal division of the Court, after reargument, in *Stettler* v. *O'Hara,* 243 U. S. 629, with respect to the validity of the minimum wage law of Oregon. Such divisions are at times unavoidable, but they point to the desirability of fresh consideration when there are material differences in the cases presented. The fact that in the *Adkins* case there were dissenting opin-

ions maintaining the validity of the federal statute, despite the nature of the standard it set up, brings out in stronger relief the ground which was taken most emphatically by the majority in that case, and that there would have been a majority for the decision in the absence of that ground must be a matter of conjecture. With that ground absent, the *Adkins* case ceases to be a precise authority.

We have here a question of constitutional law of grave importance, applying to the statutes of several States in a matter of profound public interest. I think that we should deal with that question upon its merits, without feeling that we are bound by a decision which on its facts is not strictly in point.

*Fourth.*—The validity of the New York act must be considered in the light of the conditions to which the exercise of the protective power of the State was addressed.

The statute itself recites these conditions and the State has submitted a voluminous factual brief for the purpose of showing from various official statistics that these recitals have abundant support. Judge Lehman, in his dissenting opinion in the Court of Appeals, states that the relator "does not challenge these findings of fact by the Legislature, nor does he challenge the statements in the 'factual brief' submitted by the respondent to sustain and amplify these findings." The majority opinion in the Court of Appeals has nothing to the contrary. Nor is the statement of the conditions which influenced the legislative action challenged, or challengeable, upon the record here. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78–80; *Radice* v. *New York*, 264 U. S. 292, 294; *Clarke* v. *Deckebach*, 274 U. S. 392, 397; *O'Gorman & Young* v. *Hartford Fire Insurance Co.*, 282 U. S. 251, 257, 258; *Nebbia* v. *New York*, 291 U. S. 502, 530; *Borden's Farm Products Co.* v. *Baldwin*, 293 U. S. 194, 209.

The Legislature finds that the employment of women and minors in trade and industry in the State of New York at wages unreasonably low and not fairly commensurate with the value of the services rendered is a matter of vital public concern; that many women and minors are not as a class upon a level of equality in bargaining with their employers in regard to minimum fair wage standards, and that 'freedom of contract' as applied to their relations with employers is illusory; that, by reason of the necessity of seeking support for themselves and their dependents, they are forced to accept whatever wages are offered; and that judged by any reasonable standard, wages in many instances are fixed by chance and caprice and the wages accepted are often found to bear no relation to the fair value of the service. The Legislature further states that women and minors are peculiarly subject "to the overreaching of inefficient, harsh or ignorant employers," and that, in the absence of effective minimum fair wage rates, the constant lowering of wages by unscrupulous employers, constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers and threatens the stability of industry. The Legislature deemed it essential to seek the correction of these evils by the exercise of the police power "for the protection of industry and of the women and minors employed therein and of the interest of the community at large in their health and well-being and in the prevention of the deterioration of the race." § 550.

In the factual brief, statistics are presented showing the increasing number of wage earning women, and that women are in industry and in other fields of employment because they must support themselves and their dependents. Data are submitted, from reports of the Women's Bureau of the United States Department of Labor, showing such discrepancies and variations in wages paid for

identical work as to indicate that no relationship exists between the value of the services rendered and the wages paid. It also appears that working women are largely unorganized and that their bargaining power is relatively weak. The seriousness of the social problem is presented. Inquiries by the New York State Department of Labor in coöperation with the Emergency Relief Bureau of New York City disclosed the large number of women employed in industry whose wages were insufficient for the support of themselves and those dependent upon them. For that reason they had been accepted for relief and their wages were being supplemented by payments from the Emergency Relief Bureau. Thus the failure of overreaching employers to pay to women the wages commensurate with the value of services rendered has imposed a direct and heavy burden upon the taxpayers. The weight of this burden and the necessity for taking reasonable measures to reduce it, in the light of the enormous annual budgetary appropriation for the Department of Public Welfare of New York City, is strikingly exhibited in the brief filed by the Corporation Counsel of the City as an *amicus curiae.*

We are not at liberty to disregard these facts. We must assume that they exist and examine respondent's argument from that standpoint. That argument is addressed to the fundamental postulate of liberty of contract. I think that the argument fails to take account of established principles and ignores the historic relation of the State to the protection of women.

*Fifth.*—We have had frequent occasion to consider the limitations of liberty of contract. While it is highly important to preserve that liberty from arbitrary and capricious interference, it is also necessary to prevent its abuse, as otherwise it could be used to override all public interests and thus in the end destroy the very freedom of opportunity which it is designed to safeguard.

We have repeatedly said that liberty of contract is a qualified and not an absolute right. "There is no absolute freedom to do as one wills or to contract as one chooses. . . . Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." *Chicago, B. & Q. R. Co.* v. *McGuire*, 219 U. S. 549, 567. The numerous restraints that have been sustained have often been recited. *Id.*, p. 568. *Nebbia* v. *New York, supra*, pp. 526–528. Thus we have upheld the limitation of hours of employment in mines and smelters (*Holden* v. *Hardy*, 169 U. S. 366); the requiring of redemption in cash of store orders or other evidences of indebtedness issued in payment of wages (*Knoxville Iron Co.* v. *Harbison*, 183 U. S. 13); the prohibition of contracts for options to sell or buy grain or other commodities at a future time (*Booth* v. *Illinois*, 184 U. S. 425); the forbidding of advance payments to seamen (*Patterson* v. *Bark Eudora*, 190 U. S. 169); the prohibition of contracts to pay miners employed at quantity rates upon the basis of screened coal instead of the weight of the coal as originally produced in the mine (*McLean* v. *Arkansas*, 211 U. S. 539); the regulation of the size and weight of loaves of bread (*Schmidinger* v. *Chicago*, 226 U. S. 578; *Petersen Baking Co.* v. *Bryan*, 290 U. S. 570); the regulation of insurance rates (*German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389; *O'Gorman & Young* v. *Hartford Insurance Co., supra*); the regulation of the size and character of packages in which goods are sold (*Armour & Co.* v. *North Dakota*, 240 U. S. 510); the limitation of hours of employment in manufacturing establishments with a specified allowance of overtime payment (*Bunting* v. *Oregon*, 243 U. S. 426); the regulation of sales of stocks and bonds to prevent fraud (*Hall* v. *Geiger-Jones Co.*, 242 U. S. 539); the regulation of the price of milk (*Nebbia* v. *New York*,

*supra*). The test of validity is not artificial. It is whether the limitation upon the freedom of contract is arbitrary and capricious or one reasonably required in order appropriately to serve the public interest in the light of the particular conditions to which the power is addressed.

When there are conditions which specially touch the health and well-being of women, the State may exert its power in a reasonable manner for their protection, whether or not a similar regulation is, or could be, applied to men. The distinctive nature and function of women—their particular relation to the social welfare—has put them in a separate class. This separation and corresponding distinctions in legislation is one of the outstanding traditions of legal history. The Fourteenth Amendment found the States with that protective power and did not take it away or remove the reasons for its exercise. Changes have been effected within the domain of state policy and upon an appraisal of state interests. We have not yet arrived at a time when we are at liberty to override the judgment of the State and decide that women are not the special subject of exploitation because they are women and as such are not in a relatively defenceless position.

More than forty years after the adoption of the Fourteenth Amendment; we said that it did not interfere with state power by creating "a fictitious equality." *Quong Wing* v. *Kirkendall*, 223 U. S. 59, 63. We called attention to the ample precedents in regulatory provisions for a classification on the basis of sex. We said—"It has been recognized with regard to hours of work. . . . It is recognized in the respective rights of husband and wife in land during life, in the inheritance after the death of the spouse. Often it is expressed in the time fixed for coming of age. . . . The particular points at which that difference shall be emphasized by legislation are

largely in the power of the State." *Id.* Not long before the decision in the *Quong Wing* case, the question had received elaborate consideration in *Muller* v. *Oregon,* 208 U. S. 412, where a regulation of the working hours of women was sustained. We thought that the disadvantage at which woman was placed in the struggle for subsistence was obvious and we emphasized the point that she "becomes an object of public interest and care in order to preserve the strength and vigor of the race." We added that "though limitations upon person and contractual rights may be removed by legislation," woman will still be in a situation "where some legislation to protect her seems necessary to secure a real equality of right." She therefore still may be "properly placed in a class by herself, and legislation designed for her protection may be sustained, even when like legislation is not necessary for men and could not be sustained." *Muller* v. *Oregon, supra,* pp. 421, 422. This ruling has been followed in *Riley* v. *Massachusetts,* 232 U. S. 671, *Miller* v. *Wilson,* 236 U. S. 373, and *Bosley* v. *McLaughlin,* 236 U. S. 385, with respect to hours of work, and in *Radice* v. *New York, supra,* in relation to night work.

If liberty of contract were viewed from the standpoint of absolute right, there would be as much to be said against a regulation of the hours of labor of women as against the fixing of a minimum wage. Restriction upon hours is a restriction upon the making of contracts and upon earning power. But the right being a qualified one, we must apply in each case the test of reasonableness in the circumstances disclosed. Here, the special conditions calling for the protection of women, and for the protection of society itself, are abundantly shown. The legislation is not less in the interest of the community as a whole than in the interest of the women employees who are paid less than the value of their services. That lack must be made good out of the public

purse. Granted that the burden of the support of women who do not receive a living wage cannot be transferred to employers who pay the equivalent of the service they obtain, there is no reason why the burden caused by the failure to pay that equivalent should not be placed upon those who create it. The fact that the State cannot secure the benefit to society of a living wage for women employees by any enactment which bears unreasonably upon employers does not preclude the State from seeking its objective by means entirely fair both to employers and the women employed.

In the statute before us, no unreasonableness appears. The end is legitimate and the means appropriate. I think that the act should be upheld.

I am authorized to state that MR. JUSTICE BRANDEIS, MR. JUSTICE STONE and MR. JUSTICE CARDOZO join in this opinion.

MR. JUSTICE STONE, dissenting.

While I agree with all that the CHIEF JUSTICE has said, I would not make the differences between the present statute and that involved in the Adkins case the sole basis of decision. I attach little importance to the fact that the earlier statute was aimed only at a starvation wage and that the present one does not prohibit such a wage unless it is also less than the reasonable value of the service. Since neither statute compels employment at any wage, I do not assume that employers in one case, more than in the other, would pay the minimum wage if the service were worth less.

The vague and general pronouncement of the Fourteenth Amendment against deprivation of liberty without due process of law is a limitation of legislative power, not a formula for its exercise. It does not purport to say in what particular manner that power shall be exerted.

It makes no fine-spun distinctions between methods which the legislature may and which it may not choose to solve a pressing problem of government. It is plain too, that, unless the language of the amendment and the decisions of this Court are to be ignored, the liberty which the amendment protects is not freedom from restraint of all law or of any law which reasonable men may think an appropriate means for dealing with any of those matters of public concern with which it is the business of government to deal. There is grim irony in speaking of the freedom of contract of those who, because of their economic necessities, give their services for less than is needful to keep body and soul together. But if this is freedom of contract no one has ever denied that it is freedom which may be restrained, notwithstanding the Fourteenth Amendment, by a statute passed in the public interest.

In many cases this Court has sustained the power of legislatures to prohibit or restrict the terms of a contract, including the price term, in order to accomplish what the legislative body may reasonably consider a public purpose. They include cases, which have neither been overruled nor discredited, in which the sole basis of regulation was the fact that circumstances, beyond the control of the parties, had so seriously curtailed the regulative power of competition as to place buyers or sellers at a disadvantage in the bargaining struggle, such that a legislature might reasonably have contemplated serious consequences to the community as a whole and have sought to avoid them by regulation of the terms of the contract. *Munn* v. *Illinois*, 94 U. S. 113; *Brass* v. *Stoeser*, 153 U. S. 391; *German Alliance Insurance Co.* v. *Lewis*, 233 U. S. 389, 409; *Terminal Taxicab Co.* v. *District of Columbia*, 241 U. S. 252; *Block* v. *Hirsh*, 256 U. S. 135; *Marcus Brown Co.* v. *Feldman*, 256 U. S. 170; *Levy Leasing Co.* v. *Siegel*, 258 U. S. 242; *Nebbia* v. *New*

*York,* 291 U. S. 502; see also, *Frisbie* v. *United States,* 157 U. S. 160; *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13; *McLean* v. *Arkansas,* 211 U. S. 539; *Mutual Loan Co.* v. *Martell,* 222 U. S. 225.

No one doubts that the presence in the community of a large number of those compelled by economic necessity to accept a wage less than is needful for subsistence is a matter of grave public concern, the more so when, as has been demonstrated here, it tends to produce ill health, immorality and deterioration of the race. The fact that at one time or another Congress and the legislatures of seventeen states. and the legislative bodies of twenty-one foreign countries, including Great Britain and its four commonwealths, have found that wage regulation. is an appropriate corrective for serious social and economic maladjustments growing out of inequality in bargaining power, precludes, for me, any assumption that it is a remedy beyond the bounds of reason. It is difficult to imagine any grounds, other than our own personal economic predilections, for saying that the contract of employment is any the less an appropriate subject of legislation than are scores of others, in dealing with which this Court has held that legislatures may curtail individual freedom in the public interest.

If it is a subject upon which there is power to legislate at all, the Fourteenth Amendment makes no distinction between the methods by which legislatures may deal with it, any more than it proscribes the regulation of one term of a bargain more than another if it is properly the subject of regulation. No one has yet attempted to say upon what basis of history, principles of government, law or logic, it is within due process to regulate the hours and conditions of labor of women, see *Muller* v. *Oregon,* 208 U. S. 412; *Riley* v. *Massachusetts,* 232 U. S. 671, 679; *Hawley* v. *Walker,* 232 U. S. 718; *Miller* v. *Wilson,* 236 U. S. 373; *Bosley* v. *McLaughlin,* 236 U. S.

385, and of men, *Bunting* v. *Oregon,* 243 U. S. 426, and the time and manner of payment of the wage, *McLean* v. *Arkansas, supra; Knoxville Iron Co.* v. *Harbison, supra; Patterson* v. *Bark Eudora,* 190 U. S. 169; compare *New York Central R. Co.* v. *White,* 243 U. S. 188; *Arizona Employers' Liability Cases,* 250 U. S. 400, but that regulation of the amount of the wage passes beyond the constitutional limitation; or to say upon what theory the amount of a wage is any the less the subject of regulation in the public interest than that of insurance premiums, *German Alliance Insurance Co.* v. *Lewis, supra,* or of the commissions of insurance brokers, *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.,* 282 U. S. 251, or of the charges of grain elevators, *Munn* v. *Illinois, supra; Brass* v. *Stoeser, supra,* or of the price which the farmer receives for his milk, or which the wage earner pays for it, *Nebbia* v. *New York, supra.*

These considerations were developed at length in *Tyson & Bros.* v. *Banton,* 273 U. S. 418, 447 *et seq.,* and in *Ribnik* v. *McBride,* 277 U. S. 350, 359, *et seq.,* and need not be further elaborated now. It is true that the Court rejected them there, but it later accepted and applied them as the basis of decision in *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co., supra; Nebbia* v. *New York, supra; Hegeman Farms Corp.* v. *Baldwin,* 293 U. S. 163; *Borden's Farm Products Co.* v. *Ten Eyck,* 297 U. S. 251. Both precedent, and, what is more important, reason, require their acceptance now. See *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405. In upholding state minimum price regulation in the milk industry, in *Nebbia* v. *New York, supra,* the Court declared, p. 537:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose.

The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio."*

That declaration and decision should control the present case. They are irreconcilable with the decision and most that was said in the *Adkins* case. They have left the Court free of its restriction as a precedent, and free to declare that the choice of the particular form of regulation by which grave economic maladjustments are to be remedied is for legislatures and not the courts.

In the years which have intervened since the *Adkins* case we have had opportunity to learn that a wage is not always the resultant of free bargaining between employers and employees; that it may be one forced upon employees by their economic necessities and upon employers by the most ruthless of their competitors. We have had opportunity to perceive more clearly that a wage insufficient to support the worker does not visit its consequences upon him alone; that it may affect profoundly the entire economic structure of society and, in any case, that it casts on every taxpayer, and on government itself, the burden of solving the problems of poverty, subsistence, health and morals of large numbers in the community. Because of their nature and extent these are public problems. A generation ago they were for the individual to solve; today they are the burden of the nation. I can perceive no more objection, on constitutional grounds, to their solution by requiring an industry to bear the subsistence cost of the labor which it employs, than to the imposition upon it of the cost of its industrial accidents. See *New York Central R. Co.* v. *White, supra; Mountain Timber Co.* v. *Washington,* 243 U. S. 219.

It is not for the courts to resolve doubts whether the remedy by wage regulation is as efficacious as many believe, or is better than some other, or is better even than the blind operation of uncontrolled economic forces. The legislature must be free to choose unless government is to be rendered impotent. The Fourteenth Amendment has no more embedded in the Constitution our preference for some particular set of economic beliefs than it has adopted, in the name of liberty, the system of theology which we may happen to approve.

I know of no rule or practice by which the arguments advanced in support of an application for certiorari restrict our choice between conflicting precedents in deciding a question of constitutional law which the petition, if granted, requires us to answer. Here the question which the petition specifically presents is whether the New York statute contravenes the Fourteenth Amendment. In addition, the petition assigns as a reason for granting it that "the construction and application of the Constitution of the United States and a prior decision" of this Court "are necessarily involved," and again, that "the circumstances prevailing under which the New York law was enacted call for a reconsideration of the *Adkins* case in the light of the New York act and conditions aimed to be remedied thereby." Unless we are now to construe and apply the Fourteenth Amendment without regard to our decisions since the *Adkins* case, we could not rightly avoid its reconsideration even if it were not asked. We should follow our decision in the *Nebbia* case and leave the selection and the method of the solution of the problems to which the statute is addressed where it seems to me the Constitution has left them, to the legislative branch of the government. The judgment should be reversed.

Mr. Justice Brandeis and Mr. Justice Cardozo join in this opinion.