Jack BUTLER, Appellant,

v.

CENTRAL BANK & TRUST COMPANY et al., Appellees.

No. 17502.

Court of Civil Appeals of Texas, Dallas.

July 31, 1970.

Rehearing Denied Oct. 9, 1970.

Bill Stephens, R. L. McSpedden, Collie & McSpedden, Dallas, for appellant.

L. W. Anderson, W. A. Pritchard, Anderson, Henley, Shields, Bradford & Pritchard, Dallas, for appellees.

CLAUDE WILLIAMS, Justice.

This is an appeal from a take nothing judgment rendered *non obstante veredicto* in an action for slander. Jack Butler sued Central Bank & Trust Company and its Vice-President, Stephen T. Jordan, alleging that Jordan, in his capacity as top executive officer of the bank, had uttered false and slanderous statements against him for which he was entitled to recover actual damages and also exemplary damages since such statements had been uttered with malice. Both the bank and its vice-president answered with general denials and special defenses that such statements made by Jordan were either true or clothed with privilege. Both also pled that such statements as may have been spoken by Jordan were made in good faith and without malice.

The case was tried before the court and a jury. The court submitted the case on special issues and, in response thereto, the jury found: (1) that Jordan orally stated to Bob Downs, shortly after July 28, 1967,

that Jack Butler was discharged from Central because he had purchased bank assets without authority; (2) that such statement was substantially false and untrue; (3) that the statement was made by Jordan while acting within the course and scope of his employment for Central; (4) that Butler sustained an injury by reason of such oral statement; (5) that such oral statement was a proximate cause of such injury sustained by Butler; (6) that on the occasion of making the oral statement inquired about in Special Issue No. 1 same was not made with respect to a subject matter in which Jordan and Downs had a common fiscal interest; (7) that the sum of $115,000 would fairly and reasonably compensate Butler for injury sustained by him by reason of such oral statement; (8) that such oral statement was motivated by actual malice; and (9) Butler should be awarded exemplary damages in the sum of $25,000.

Butler filed his motion for judgment on the verdict. Central and Jordan filed an original and two amended motions for judgment *non obstante veredicto*. The trial court sustained the second amended motion for judgment *non obstante veredicto* and rendered judgment that Butler take nothing against either of the defendants.

Appellant attacks the judgment primarily upon the contention that there was evidence to support each of the jury's answers to the issues and therefore the trial court was without authority to set aside and disregard such answers but should have granted judgment for Butler based upon the jury's verdict.

Appellees, by counterpoints, contend that the trial court correctly disregarded the court's charge to the jury and their answers thereto because same were immaterial or had no support in the evidence. Appellees also present fourteen cross-points of error.

We first consider the question presented concerning the propriety of the action taken by the trial judge. Rule 300, Vernon's Texas Rules of Civil Procedure, directs that where a special verdict is rendered the judge shall (a) render judgment thereon unless set aside or a new trial is granted, or (b) render judgment notwithstanding the verdict. Rule 301, T.R.C.P., governs the rendition of judgment *non obstante veredicto*. It is there provided that upon motion and reasonable notice the court may render judgment *non obstante veredicto* if a directed verdict would have been proper, and provided that the court may, on motion and notice, disregard any special issue jury finding that has no support in the evidence.

It is established law that to sustain the action of the trial court in granting a motion for judgment *non obstante veredicto* it must be determined that there was no evidence of probative force to support the answers of the jury to the special issues sought to be set aside. Judicial review of the court's action in sustaining the motion for judgment notwithstanding the verdict requires that all testimony must be considered in the light most favorable to the party against whom the judgment was rendered and every reasonable intendment deducible from the evidence is to be indulged in favor of the jury verdict. Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194 (1952); Leyva v. Pacheco, 163 Tex. 638, 358 S.W.2d 547 (1962); McGill v. Minyard's Food Stores, Inc., 417 S.W.2d 309 (Tex.Civ.App., Dallas 1967, writ ref'd n. r. e.).

In the light of these rules we have carefully considered the testimony introduced before the jury relating to the special issues submitted and have reached the conclusion that there is some evidence of probative force, beyond a mere scintilla, to support the jury's answer to each of the issues. We also conclude, contrary to appellees' contention, that each of the special issues submitted was material in the light of the pleadings and the testimony.

The record reveals that appellant Butler, 36 years of age, had been engaged in the

banking business for several years and on the occasion in question he was employed as an assistant vice-president and loan officer of appellee Central Bank & Trust Company. Jordan was the chief executive officer of the bank. In July 1966 Butler, and another employee of the bank, Carroll Thomas, had borrowed $351.62 from the bank to purchase a pickup truck from the bank, which had been repossessed, such loan being obtained by the execution of a promissory note to the bank, which note was authorized by Stephen T. Jordan for the very purpose of purchasing the truck. The amount of the note had been repaid to the bank. In the summer of 1967 Mr. Butler took his regular two weeks vacation and upon his return was called into the bank by Jordan and discharged. Butler demanded an explanation for his discharge. Butler testified:

"Q Mr. Butler, just tell us your conversation with Mr. Jordan.

A Briefly, Mr. Jordan told me that the Board had asked for my resignation and I asked him why and he said, well, he said that I was mainly—it was due to the fact I was involved on this pickup deal with Carroll Thomas.

Q What did he say to you about the pickup deal?

A He told me that I—we bought the pickup without authorization, that we were jointly involved in financing it for this Claude Mitchell which ultimately created a loss for the bank and that the bank considered me—the Directors considered me untrustworthy.

Q What did you say to him?

A I told him that I did have authorization. I asked him if he did not remember authorizing that note to Carroll Thomas and I when the pickup was sold to us and he said 'No.' I said 'Well, you did' and he denied that he knew anything about it whatsoever."

Jordan testified that it had been brought to his attention that he had initialed a loan but that he did not recall doing so. He said that he at no time ever told the Board of Directors of the bank that he had okayed the note that loaned the money to purchase the pickup truck. Jordan said that the pickup truck transaction was the "straw that broke the camel's back" as far as Butler's discharge was concerned; that six months prior to this on two different occasions his ability was strongly questioned by the Board of Directors and he was directed to ask Butler for his resignation immediately. He said that Sanders H. Campbell, Chairman of the Board of the bank, directed him to request the resignation of Butler.

Following his discharge from the bank Butler sought employment at other banking institutions and on each occasion was given a cordial reception but, after a period of time, he was refused employment. It came to Butler's attention that Jordan had reported to people that Butler was guilty of purchasing bank assets without authority and had resold same at a profit. Appellee Jordan had a conversation with one Bob Downs, of the Republic National Bank of Dallas, a personal friend of Butler's and who had recommended him for employment with appellee bank. This conversation took place after July 27, 1967. Downs testified that he called Jordan to find out why Butler had been discharged. He said that Jordan told him that Butler, and another loan officer, had been making loans, primarily automobile loans, that subsequently were charged off and the cars repossessed because of nonpayment. Butler and the other man were buying the cars from the bank at a very low price and within a week or two reselling them at a profit to themselves. Downs said that he considered this to be improper and not permissible in banking business and if one of his officers working for him did that he would have him prosecuted. Following this conservation with Jordan, Downs then talked to Butler:

"A And I asked Jack if what I had heard was correct and he said it was.

And then I told Jack that I would not be able to help him because I felt like that he had betrayed my confidence. If I recommend a man for a job and then he turns out bad, well, of course, the person I recommended to is going to come back to me and say, 'Why did you do that?' In our business we can't afford to do that."

Jordan admitted that he had had a conversation with Downs and had told Downs exactly the facts concerning the purchase of the pickup truck by Butler. He told Downs that Butler had been discharged because of the pickup truck transaction. In the conversation Jordan did not tell Downs that he, Jordan, had authorized the purchase of the pickup truck in question.

Butler testified that after his discharge he was told by various people that Jordan had told them about the pickup truck transaction at the bank and some "wrongdoing". He said Mr. Willemon, of the First Bank at Carrollton, had told him that he had talked with Jordan who had told him that Butler had been involved in a pickup transaction. Willemon told Butler that if he got this "cleared up" the bank would consider his application for employment. Butler said that he had not been employed since his discharge, except on one occasion by a bank at Howe, Texas for a short time, and that he had been rendered nervous and irritable as a result of what had been said about him. In this connection he testified that for a long time he was in a confused state of mind; that he did not know what was going to happen to his family since he had been let out of the bank without a recommendation; that he could not relax at home and did not have a normal family life because of his mental state; that because of the charge that he was not trustworthy he could not go out and face his friends and the public; that he could not sleep at night. On cross-examination he admitted that prior to the occasion in question he had had a nervous problem and had been treated by several doctors for nervousness and a condition which resulted in a defect in walking.

■ The term "slander", as it relates to modern usage, is applied to oral defamations only, both in its technical use and its common acceptation. "Defamatory language may be actionable per se, that is, in itself, or may be actionable per quod, that is, only on allegation and proof of special damages. The distinction is based on a rule of evidence, the difference between them lying in the proof of the resulting injury." 36 Tex.Jur.2d, Libel and Slander, § 2, pp. 280–281. In general, oral words, however opprobrious, are not actionable without proof of special damages, unless they impute to another the commission of a crime or affect a person injuriously in his office, profession or occupation. 36 Tex. Jur.2d, § 3, pp. 282–283.

In the recent case of Arant v. Jaffe, 436 S.W.2d 169 (Tex.Civ.App., Dallas 1968), we reviewed the authorities relating to actions for slander and pointed out that what constitutes defamatory language is a question of law for determination by the court. It had been held that to charge an employee with dishonesty in his dealings with his employer is slanderous per se in that it falls within the general classification of words that "affect a person injuriously in his office, profession or occupation." West Texas Utilities Co. v. Wills, 164 S. W.2d 405 (Tex.Civ.App., Austin 1942); Billington v. Houston Fire & Casualty Co., 226 S.W.2d 494 (Tex.Civ.App., Fort Worth 1950); 36 Tex.Jur.2d, § 18, p. 303.

■ As to the defense of qualified privilege advanced by appellees it has been said that, "Qualified privilege comprehends all communications made in good faith on any subject matter in which the author has an interest, or with reference to which he has a duty to perform, to another person having a corresponding interest or duty." 36 Tex.Jur.2d, § 71, pp. 357–358. "Accusations against an employee by his employer or another employee, made to a person having a corresponding interest or duty in

the matter to which the communication relates, are qualifiedly privileged." 36 Tex. Jur.2d, § 79, p. 366. However, the privilege is lost if the defendant was in any degree actuated by malice in making or publishing the defamatory statement. Neither does the privilege exist if he who utters the statement was actuated by malice in part and in part by lawful motive. 36 Tex.Jur.2d, § 90, p. 387; Cranfill v. Hayden, 97 Tex. 544, 80 S.W. 609 (1904).

■ Bearing in mind these well defined rules of law relating to defamation and applying same to a proper judicial review of the record presented, we find, and so hold, that there is some evidence of probative force to justify both the submission to the jury of the special issues and the jury's responses made thereto. Accordingly, we hold that the trial court was in error in sustaining appellees' motion for judgment *non obstante veredicto* and in rendering the take nothing judgment against appellant.

Our action in reference to appellant's first point renders it unnecessary that we consider or pass upon appellant's Points 2 and 3 which relate to procedural matters.

We turn now to a consideration of appellees' cross-points of error which are properly presented pursuant to Rule 324, T.R.C.P., as amended in 1957. This rule requires the appellee, in an appeal from a judgment *non obstante veredicto* in his favor, to bring forward by cross-points in his brief in the Court of Civil Appeals all complaints against the verdict and any judgment based thereon except for complaints that "require the taking of evidence in addition to that adduced upon the trial of the cause." Our Supreme Court in the case of Jackson v. Ewton, 411 S.W.2d 715 (Tex.Sup.1967), pointed out that the purpose of this amendment was to require a final disposition of the case by the appellate court, where a judgment notwithstanding the verdict is erroneously rendered by the trial court, on the basis of the record before it. See also an exhaustive discussion concerning the rule in the case of Bardwell v. Anderson, 325 S.W.2d 929 (Tex.Civ.App., Houston 1959).

Appellees' cross-points 1, 2, 3, 5, 7 and 10 all relating to the charge of "no evidence" and "immateriality" of various special issues are overruled. We also overrule cross-points 4 and 6 complaining of the insufficiency of the evidence to support the answers of the jury to Special Issues 4 and 5 having to do with injury and proximate cause.

■ Appellees' eleventh cross-point of error complains that the jury's answer to Special Issue No. 8 is contrary to the great weight and preponderance of the evidence. This special issue inquired concerning the actual malice which motivated the defamatory statement. We have carefully reviewed this record in accordance with a mandate of the Supreme Court laid down in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1952), and having done so, we are of the opinion, and so hold, that the jury's finding that the statements made by Jordan were actuated by malice is contrary to the overwhelming weight and preponderance of the evidence.

Appellant, in defense of the jury findings, lays great stress upon the testimony of Butler to the effect that he called Jordan's attention to the fact that he, Jordan, approved the loan for the purchase of the pickup truck. He also argues that even though Jordan may not have remembered the transaction which took place about a year prior to the conversation yet he could have easily checked the books and records of the bank to determine the truth of the situation and that his failure to do so is positive evidence of malice. Our Supreme Court in El Paso Times, Inc. v. Trexler, 447 S.W.2d 403 (Tex.Sup.1969), held that failure to investigate the truth or falsity of a statement before it is published has been held insufficient to show actual malice. The court further held that negligence or failure to act as a reasonably prudent man is likewise insufficient. To the same ef-

fect see Dun & Bradstreet, Inc. v. Truman O'Neil, 456 S.W.2d 896 (Tex.Sup.1970).

The testimony is indeed somewhat vague and uncertain concerning Jordan's connection with the approval of the loan in question. We believe that the answer of the jury in response to Special Issue No. 8 is contrary to the overwhelming weight and preponderance of the testimony so that such finding must be set aside.

We likewise sustain appellees' cross-points 8, 9, 12 and 13 in which they contend that the answers of the jury to the damage issues, being Issues 7 and 9, are grossly excessive so as to shock our sense of justice. However, since the case must be reversed and remanded on other grounds we do not consider the question of remittitur. Rule 440, T.R.C.P.

For the reasons assigned the judgment of the trial court is reversed and the case remanded to the trial court for a new trial.

Reversed and remanded.