Steven **LITTLE**, Appellant,

v.

Jack **BRYCE** and Randall's Food Markets, Inc., Appellees.

No. 01–86–00691–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 11, 1987.

---

James R. Kuhn, Houston, for appellant.

Scott Reiter Link, Williams & Smith, Stephen Neel, Williams & Smith, Houston, for appellees.

Before EVANS, C.J., and SAM BASS and LEVY, JJ.

SAM BASS, Justice.

The appellant, Steven Little, appeals from a summary judgment dismissing his suit for slander and wrongful termination of employment.

We reverse and remand for trial.

Little sued appellees, Jack Bryce and Randall's Food Markets, Inc., alleging that while he was employed as a meat cutter with Randall's, Bryce (his co-worker) called Little, and Little told him that he was hospitalized for a ruptured hernia and that one of his roommates was being tested for AIDS. Little alleged that Bryce then informed Little's co-workers and supervisors that Little might have AIDS and had been exposed to AIDS by his roommate. He alleged that Bryce knew the statement to be false, that it was knowingly, willfully, and maliciously communicated to third parties, and that as a result, Little was terminated from his employment. He alleged that when he was called to the office of Randall's meat supervisor, he was asked if he had AIDS, and he denied that he did. He was told that he could either voluntarily resign or be terminated for reasons of health, and he chose to be terminated. In his petition, he sought actual damages of $30,000 and $300,000 exemplary damages for the alleged slanderous conduct. Little also alleged that his termination was wrongful because it violated the public policy of the state as set forth in the Commission on Human Rights Act of 1983, sec. 1.04(b); 2.01(7)(B) and 5.01(1), in that he was a handicapped person within the meaning of that act. He alleged that because of such wrongful termination, he was entitled to recover $30,000 in lost wages.

■ The appellees answered the appellant's petition, asserting that the statements made about the appellant to Randall's personnel were true and protected by a qualified privilege. But after the appellees changed counsel in the case, they filed an amended answer, asserting only a general denial. Because the issue of a qualified privilege in a defamation action is an affirmative defense, it must be pled; otherwise it is waived. *Dealers' National Insurance Co. v. Rose*, 396 S.W.2d 535, 536 (Tex.Civ.App.—Waco 1965, writ dism'd by agr.); Tex.R.Civ.P. 94.

■ In point of error one, the appellant contends that the trial court's summary judgment was improperly granted, because the appellees failed to conclusively prove they were entitled to the protection of a qualified privilege.

We sustain this point, because we have concluded that the appellees were not entitled to summary judgment on their affirmative defense of qualified privilege, in the absence of a pleading raising that issue.

*Debord v. Muller,* 446 S.W.2d 299, 301 (Tex.1969). Because of the disposition of the first point of error, we do not consider appellant's second point of error, in which he contends that the appellees failed to negate malice, or his third point of error, in which he contends that his petition states a valid cause of action for wrongful termination of employment.

We finally direct our attention to the concurring opinion, which sets forth the author's viewpoints on issues other than those considered by the majority and that are not necessary to the disposition of this appeal.

Our function, as an intermediate appellate court, is to state, as briefly and succinctly as possible, the dispositive issues and to declare and apply the law. We are not authorized to issue opinions that are merely advisory in nature, and we are admonished that our opinions should never be used simply to publish our particular views on a matter of special interest. *See* Parker, *Improving Appellate Procedure,* 25 N.Y.U.L.Rev. 1, 12–13 (1950); *see also,* Lefler, *Appellate Judicial Opinions* (West Pub.Co.1974).

Our mandate, under Tex.R.App.P. 90, is to decide every substantial issue that is raised and *necessary* to the disposition of the appeal, and then, to hand down a written opinion that is as brief as practicable. Where, as in the case at bar, there is one clearly settled issue that disposes of the appeal, we should write a brief opinion, which "should not be published." *Id.*

Here, there is no need for the court's discussion of any matters that are not dispositive of the appeal. The issues discussed in the *concurring* opinion are matters that should be determined only after a full development of the evidence in a trial on the merits. *See* 4 R. McDonald, *Texas Civil Practice in District and County Courts,* sec. 17.26.12 (1984). Because we

have not considered the merits of the issues discussed in the concurring opinion, we express no views thereon, and we expressly disassociate ourselves from the views expressed by the author of the concurring opinion.

The summary judgment is reversed, and this cause is remanded for trial.

LEVY, Justice, concurring.

Although I concur in the reversal, I am somewhat discomfited with the majority's disposition of the third point of error, asserting a wrongful termination of employment. It deserves further comment here.

The judicially-created "employment-at-will" doctrine was invoked by the trial court as a complete bar to appellant's claim for wrongful termination. It is a tenacious vestige from the industrial revolution and *laissez-faire* economics,[1] when there was no perceived social responsibility, much less government intervention in the economy, to protect or assist those who had been permanently displaced from their farms and, without land, wealth, or material resources, attempted to earn their living by their labor, the only asset they possessed. In the middle of the industrial revolution, modes of production and distribution of commodities were drastically being mechanized, modern nation-states were taking shape, and a once dominant agricultural economy was rapidly being transformed into an unprecedented industrial and urban-centered economy. Human labor and dignity, and the general status of the poor and propertyless, were then matters of secondary, if any, importance. Only as theories of wider democratic participation in the national culture, economy, and political life gradually took hold, were more enlightened concepts of the worth and dignity of a human being developed and accepted.

---

1. Some commentators trace the origin of the at-will doctrine to England's Statute of Labourers, enacted in the 14th century in response to a severe labor shortage caused by the Black Death. *See* Comment, *The At-Will Doctrine: A Proposal to Modify the Texas Employment Relationship,* 36 Baylor L.Rev. 667 (1984).

"It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right," Justice Frankfurter wrote in *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). In these closing decades of the 20th century, it is fair to say that now, in contrast with 18th century social modes, a servant is no longer considered virtually his master's slave, and we deem the dignity and worth of the human being to be not only "reasonable and right," but of paramount importance. Today, the absolute "employment-at-will" doctrine is increasingly seen as a harsh anachronism, not a baby brought by a constitutional stork, but a doctrine born out of the travail of 19th century economic circumstances. *See Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex.1985) (Kilgarlin, J., concurring). Accordingly, our Legislature has created some narrow exceptions to this doctrine: an employer may not terminate an employee for membership or nonmembership in a labor union,[2] for serving on a jury,[3] for filing a workmen's compensation claim,[4] for being on active military duty,[5] or for being of a particular race, color, religion, national origin, age, sex, or for having a handicap.[6] Recently, the Supreme Court of Texas, invoking its authority to judicially amend the absolute "at-will" doctrine, added the prohibition against firing an employee for refusing to perform an illegal act. *Sabine Pilot Service*, 687 S.W.2d at 735. Additionally, federal laws prohibit discharge of an employee to prevent his obtaining vested pension rights, for exercising his right to a statutory minimum wage and overtime and to a safe workplace, or for causing proceedings to be instituted (or for testifying) against his employer for violations of various federal acts. *See* Comment, *The At-Will Doctrine: A Proposal to Modify the Texas Employ-*

*ment Relationship*, 36 Baylor L.Rev. at 669.

Because we no longer tolerate the legal treatment of working people as faceless serfs, whose function primarily was to serve as commodities or cogs in the industrial wheel, so too *stare decisis* may be regarded in the law of employment relationships not as a universal, inexorable command, but only as a *generally* wise rule of law, which nevertheless bows to the *particular* lessons of experience and the force of better reasoning. We are not disabled from correcting ourselves, and should recognize that too rigid an adherence to outworn precedent may unduly restrict the proper development of the law. Perhaps nowhere else does the law more acutely need further logical and humane development than in its treatment of the employment relationship.

> It is difficult to imagine any grounds, other than our own personal economic predilections, for saying that the contract of employment is any the less an appropriate subject of legislation than are scores of others, in dealing with which this Court has held that legislatures may curtail individual freedom in the public interest.

*Morehead v. New York*, 298 U.S. 587, 633, 56 S.Ct. 918, 933, 80 L.Ed. 1347 (1936) (Stone, J., dissenting).

Curtailing an employer's "individual freedom" to arbitrarily discharge an employee does not necessarily suggest or result in the employer's utter lack of control of his business; put affirmatively, it means judicially recognizing an employee's serious concern and interest in his livelihood. This is, as I see it, *vitally* in the public interest. Losing a job today, in this age of increasing technology, specialization of employee skills, and an unstable, if not contracting, economy, is very risky for the worker

---

**2.** Tex.Rev.Civ.Stat.Ann. art. 5207a (Vernon 1987).

**3.** Tex.Civ.Prac. & Rem.Code Ann. sec. 122.001 (Vernon 1986).

**4.** Tex.Rev.Civ.Stat.Ann. art. 8307(c) (Vernon Supp.1987).

**5.** Tex.Rev.Civ.Stat.Ann. art. 5765, sec. 7(a) (Vernon Supp.1987).

**6.** Tex.Rev.Civ.Stat.Ann. art. 5221k, sec. 5.01(1) (Vernon 1987).

whose livelihood depends entirely upon his labor. Neither state nor federal government provides the institutional structure to assure continued employment or to guarantee that the worker will even be able to find another job if he is fired.

This case contrasts a hoary legal doctrine with current notions of fairness and decency, approaching the melodramatic in its elements: the appellant, having enjoyed for the three years of his employment by appellee Randall's Food Markets ("Randall's") a "perfect personnel record," was accused by another employee, appellee Jack Bryce, either of having AIDS, a frightening, because lethal and to some extent communicable, disease, or of living in an apartment with a person who was then being tested to see if he had the disease. Kenneth Fleming, appellant's immediate supervisor, summarily fired the appellant after giving him an opportunity, which was refused, to voluntarily resign. Fleming admitted that none of the normal termination procedures were followed. It appears to be undisputed that neither the appellant nor his roommate were in fact afflicted by the disease, and that Randall's made no effort whatever to investigate the accusation, or to verify at least that appellant was ill. He was fired without a hearing, after being condemned by an accusation based on hearsay.

By virtue of the Texas Commission on Human Rights Act of 1983, Tex.Rev.Civ. Stat.Ann. art. 5221k, sec. 5.01,[7] an employer is forbidden to discharge or discriminate against an employee, *inter alia*, because of a handicap, to ensure that handicapped individuals are not denied jobs or opportunities because of the prejudice, fears, or ignorance of others. Quite recently, the United States Supreme Court held in *School Board v. Arline*, —— U.S. ——, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987); that "handicapped individual" meant any person who "(i) has a physical ... impairment which substantially limits one or more of his major life activities,[8] (ii) has a record of such impairment, or (iii) *is regarded as having such an impairment.*" (Emphasis supplied.) *Arline* involved comparable federal law, viz., section 504 of the Rehabilitation Act of 1973, 29 U.S.C. sec. 794,[9] which prohibits a federally funded state program from discriminating against a handicapped individual solely by reason of such handicap. Essentially, the Court decided that a contagious disease may be a "handicap" under section 504, and remanded the case to the trial court for an "individualized inquiry" to determine whether the risks of infection precluded plaintiff from being "otherwise qualified" for her job as an elementary school teacher.

Especially pertinent to the case at bar is the Court's validating the federal protection of "those individuals who are simply 'regarded as having' a physical or mental impairment which in fact does not substantially limit that person's functioning ... but could nevertheless substantially limit that person's ability to work as a result of

7. Section 5.01 of the Texas Commission on Human Rights Act provides in pertinent part:
   It is an unlawful employment practice for an employer:
   (1) to fail or refuse to hire or to discharge an individual or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, handicap, religion, sex, national origin, or age; ...

8. In determining whether a particular individual is "handicapped" as defined by the Acts, both Texas and federal, the regulations promulgated by the United States Department of Health and Human Services, with the oversight and approval of Congress, are of significant assistance. The regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 CFR sec. 84.3(j)(2)(ii) (1985).

9. Section 504 of the Rehabilitation Act, patterned after Title VII of the Civil Rights Act of 1964, reads in pertinent part:
   No otherwise qualified handicapped individual in the United States, ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... 29 U.S.C. sec. 794.

the negative reactions of others."[10] Although *some* persons who have contagious diseases may pose a serious health threat to others under certain circumstances, the Court held that this "does not justify excluding from the coverage of the Act *all* persons with actual or perceived contagious diseases." The Court was not unmindful of the "legitimate concerns of [employers] to avoid exposing others to significant health and safety risks," and accordingly directed the trial court to initiate an inquiry as described before, deferring to the reasonable medical judgments of public health officials, and make findings of fact about the nature, duration, and severity of the risk, and the probability of the disease being transmitted and causing various degrees of harm. The Court concluded that "the fact that a person with a record of a physical impairment is also contagious does not suffice to remove that person from coverage under section 504."

A dominant theme recurring throughout the Supreme Court's *Arline* opinion is *the necessity to conduct a fair inquiry* to determine the existence and nature of the handicap. Such a hearing would both protect the public and provide the employee a decent opportunity to show either that he has no contagious disease, that the risk of infection is minimal or perhaps non-existent, that the employer can make a "reasonable accommodation" for the employee (without unnecessarily intruding upon the employer's legitimate authority to manage and operate his business), or some other mitigating factors.

But appellees argued both in their brief and on submission that "appellant was an employee-at-will subject to termination for a good reason, bad reason, or no reason at all." Moreover, despite the absence of proof that appellant was afflicted with any

disease, Randall's admitted that it did not attempt to verify the veracity of the rumor, and argued that it was under no duty to investigate the situation. I cannot accept the facile argument that today, an employer's prerogatives are or should be as royal, absolute, and beyond question as an employer's were in 19th century England, or that an employee, despite the devotion of his energies, his time, his loyalty, and his sweat, and given his (as in this case) "perfect personnel record," has no vested property interest whatever in his job, which in many instances constitutes the only source of his livelihood *and is important to his enjoyment of life*. Neither do I believe that such an employee interest in his job is inherently incompatible with the employer's necessary authority to eliminate incompetent or irresponsible workers to protect his economic interests. Nor can I accept the assertion that an employer is without any obligation to conduct a reasonable inquiry if a question is raised about an employee being contagiously ill, before being entitled to discharge the employee *for that reason*. This assumption by the appellee of arbitrary and irresponsible power, judicially established in Texas about one hundred years ago,[11] cuts against our national grain; it flatly denies our 20th century national commitment to fairness and justice, and serves to perpetuate the convenient but deceptive fiction that there is equal bargaining power between employer and employee. Loss of a job is usually not less than a severe inconvenience and, not infrequently, a financial and emotional catastrophe, for the worker who has no other source of income. We cannot continue thus, "ignoring the economic and social realities of modern society, for it is that very society we are here to serve. As that society changes, so must our thinking."

**10.** To combat the effects of common but mistaken perceptions about the handicapped, stemming not only from simple prejudice but also from archaic laws and attitudes, Congress expanded the definition of "handicapped individual" to preclude discrimination against "a person who has a record of, or is regarded as having, an impairment but who may at present have no

actual incapacity at all." *Southeastern Community College v. Davis*, 442 U.S. 397, 405–406, n. 6, 99 S.Ct. 2361, 2366–67, n. 6, 60 L.Ed.2d 980 (1979).

**11.** *See East Line & R.R.R. Co. v. Scott*, 72 Tex. 70, 75, 10 S.W. 99, 102 (1888).

*Savodnik v. Korvettes, Inc.,* 488 F.Supp. 822, 826, 827 (E.D.N.Y.1980).

[T]he nature and the theory of our institutions of government ... do not mean to leave room for the play and action of purely personal and arbitrary power ... For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails.... *Yick Wo v. Hopkins,* 118 U.S. 356, 369–70, 6 S.Ct. 1064, 1070–71, 30 L.Ed. 220 (1886).

Our whole national policy is never to condemn or penalize upon accusation only without, first, a fair hearing upon reasonable notice and satisfactory proof. Such is the very essence of Due Process, a civilized concept embodying our fundamental commitment to procedural fairness, which is immediately relevant to the employment relationship and, specifically, to the prevention of unjust dismissals.

Due Process is not confined in its scope to the particular forms in which rights have heretofore been found to have been curtailed for want of procedural fairness. Due Process is perhaps the most majestic concept in our whole constitutional system. While it contains the garnered wisdom of the past in assuring fundamental justice, it is also a living principle not confined to past instances.

*Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 173–4, 71 S.Ct. 624, 650, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

I realize that the Texas Commission on Human Rights Act is an independent and adequate state ground as to which we are not strictly bound to follow comparable federal caselaw, but the supporting rationale of *Arline* clearly provides analytic support in the instant case. Especially applicable to the case at bar is the federal definition of "handicapped" as any person *who is regarded as having an impairment* that substantially limits one or more of his major life activities. Appellant, who was thought to have AIDS, a currently fatal disease, was plainly and severely "handicapped" under the *Arline* definition. He was fired by Fleming "for safety/health reasons" only, which later proved to be groundless.

This more enlightened age suggests that we imply a "good faith and fair dealing" clause into each employment contract, following the examples of at least Alaska, California, Connecticut, Illinois, Montana, Massachusetts, and New Hampshire.[12] *See Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251, 1256–1257 (1977); *Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 551 (1974). It is not unreasonable to read into an employment relationship an implied promise by the employer not to act arbitrarily in dealing with the employee, conditioned upon fair dealing by the employee and good faith performance of his duties. *See Cancellier v. Federated Dept. Stores,* 672 F.2d 1312, 1318 (9th Cir.1982), *cert. denied,* 459 U.S. 859, 103 S.Ct. 131, 74 L.Ed.2d 113 (1982). A *mutual* commitment to good faith and fair dealing would at least tend to equalize the normally overwhelming disparity in bargaining power between the employer and the worker seeking a job, and thus tend to make more genuine the desirable "meeting of the minds" in forming an employment relationship. Such a commitment, if it had been effectuated by the parties hereto, could well have made much of this litigation unnecessary. I note, incidentally, that no question of appellant's "good faith and fair dealing" with his employer was ever raised by the appellees; he had, as mentioned before in describing Fleming's evaluation, a "perfect personnel record" with Randall's.

Returning to the procedural specifics of this case, it is firmly settled that in review-

---

**12.** Approximately 32 states have judicially carved exceptions out of the "employment-at-will" doctrine in the last thirty years. See Com-ment, *The At-Will Doctrine: A Proposal to Modify the Texas Employment Relationship,* 36 Baylor L.Rev. at 668 n. 14.

ing a summary judgment, we accept as true the non-movant's version of the evidence and draw every reasonable inference in the non-movant's favor. *Sabine Pilot Service, Inc.,* 687 S.W.2d at 734; *Gulbenkian v. Penn,* 151 Tex. 412, 252 S.W.2d 929, 931 (1952). To sustain the summary judgment, the movant must establish as a matter of law that no genuine issue of material fact exists. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). Appellees have, in my view, failed to discharge that burden, not only with regard to the qualified privilege issue, but particularly with respect to appellant's third point of error, and at least the following factual issues: (1) Was appellant fired because he was regarded by Randall's as being handicapped, as defined? (2) If so regarded as handicapped, was appellant's discharge wrongful?

It follows from the above discussion, of course, that I believe that an employee's claim that he was wrongfully discharged for being mistakenly accused of having a contagious and loathsome disease *also* constitutes a cause of action for defamation, because it would tend to deter others from associating with him and disparage him in the eyes of the community. Appellant is entitled to have his day in court on these issues. We need not be bound by prior legislative or judicial inaction in this area of tort law because, as the Texas Supreme Court held in *Sanchez v. Schindler,* 651 S.W.2d 249, 252 (1983), "tort law ... has traditionally been developed primarily through the judicial process." Courts "possess the legitimate heritage of common law innovation that develops new principles to accommodate changing values." *Ivy v. Army Times Publishing Co.,* 428 A.2d 831, 835 (D.C.App.1981) (Ferren, J., dissenting).

The appellees argue that their summary judgment proof asserts the existence of a qualified privilege and negates malice as a matter of law. I agree with the majority that the appellees' answer, consisting only of a general denial, does not raise the af-

firmative defense of qualified privilege. Appellees, therefore, were not entitled to a summary judgment when their pleadings wholly failed to authorize either the affirmative defense asserted at the summary judgment hearing or the judgment granted on the basis of such unauthorized proof. For reasons of judicial economy, however, I think that we should address the appellees' substantive arguments, rather than simply reversing on a narrow procedural ground and have the case come bouncing back on appeal with most of the same issues presented. My review of the evidence in this case indicates that important questions of fact exist concerning the qualified privilege defense and the presence of malice.

"Qualified privilege" is a matter of law only when the facts underlying the assertion of the privilege are not contested. *Dixon v. Southwestern Bell Telephone Co.,* 607 S.W.2d 240, 242 (Tex.1980). A qualified privilege is an affirmative defense in the nature of confession and avoidance, and is defined as "(a) communication on a subject in which the author or the public has an interest, or with respect to which the author has a duty to perform to another owing a corresponding duty ... Accusations against an employee by his employer or another employee made to a person having a corresponding interest or duty in the matter to which the communication relates, are qualifiedly privileged." *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 630 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The Corpus Christi Court of Appeals held that a "qualified privilege occurs where the social policy considerations (public policy and interest) are of relatively less weight so that inquiry into the motive and reasonableness behind the statement is permitted. Such communications are privileged when made in good faith on any subject matter in which the author has an interest, or with reference to which he has a duty to perform to another person having a corresponding interest or duty." *Associated Telephone Director Publishers, Inc. v.*

*Better Business Bureau of Austin, Inc.,* 710 S.W.2d 190, 192 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.).

Even if a defendant successfully establishes that his communication was made subject to a qualified privilege, that privilege is "lost if the communication was made with malice or want of good faith." *Ramos v. Henry C. Beck Co.,* 711 S.W.2d 331, 335 (Tex.App.—Dallas 1986, no writ); *Houston v. Grocers Supply Co.,* 625 S.W.2d 798, 801 (Tex.App.—Houston [14th Dist.] 1981, no writ); *Bergman v. Oshman's Sporting Goods, Inc.,* 594 S.W.2d 814, 816 n. 1 (Tex.Civ.App.—Tyler 1980, no writ). Neither does the privilege exist if he who utters the statement was actuated by malice in part, and in part by a lawful motive. *Stearns v. McManis,* 543 S.W.2d 659, 664 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ dism'd); *Butler v. Central Bank & Trust Co.,* 458 S.W.2d 510, 515 (Tex.Civ. App.—Dallas 1970, writ dism'd).

The courts of appeals appear to be in conflict concerning the type of malice required to negate a qualified privilege, i.e., whether the plaintiff must show "actual" malice or "common law" malice. "Actual" malice is the term most often derived from the United States Supreme Court's definition of subjective malice set out in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Sullivan* defined "actual" malice as requiring a showing that the defamatory statement was made with knowledge that it was false, or with reckless disregard of whether it was false. *Id.* at 279–280, 84 S.Ct. at 725–26; *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 3004 n. 6, 41 L.Ed.2d 789 (1974). In contrast, "common law" malice is defined as ill will, or bad or evil motive. *Marathon Oil Co.,* 682 S.W.2d at 631; *Buck v. Savage,* 323 S.W.2d 363, 378 (Tex.Civ.App.—Houston [1st Dist.] 1959, writ ref'd n.r.e.). "Actual" malice, in the sense of known or reckless falsity, focuses on the defendant's attitude towards the truth irrespective of the defendant's motivation, while "common law" malice fo-

cuses on the defendant's attitude towards the plaintiff. Recklessly false statements are usually an abuse of a privileged occasion, and the privilege is thereby lost. Fear or prejudice towards a person or a particular subject may so influence or dominate a person's mind that he could become reckless about truth or falsity and the rights and interests of others. Thus, his defamatory remarks would be made with "malice" because they were motivated by such feelings and not spoken from the sense of duty that underlies the privilege. *See* R. Sack, *Libel, Slander & Related Problems* 331–35 (1980).

The San Antonio Court of Appeals stated that "[t]here is no question but that the defense of common law conditional privilege can be overcome by a showing of actual malice." *Bolling v. Baker,* 671 S.W.2d 559, 564 (Tex.App.—San Antonio 1984, writ dism'd), *cert. denied,* 474 U.S. 824, 106 S.Ct. 79, 88 L.Ed.2d 64 (1985); *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 900 (Tex.1970). However, the Court did not state that the plaintiff was required to prove "actual" malice.

This Court has stated that the malice required to defeat a qualified privilege may be

established by proof of facts and circumstances from which it may reasonably be inferred. It may be shown by, among other things, proof that the defendant entertained ill-will toward the complaining party.

*Stearns,* 543 S.W.2d at 663; *Buck,* 323 S.W.2d at 378.

Apparently, plaintiff may defeat the defendant's conditional privilege by proving that the defendant acted with *either* "actual" or "common law" malice. Because the defendant, although enjoying a conditional privilege, would be liable if actuated by malice, the appellees herein, as movants and defendants, have the burden to prove the *absence* of malice on their motion for summary judgment. *Ramos,* 711 S.W.2d at 335; *Jackson v. Cheatwood,* 445 S.W.2d 513, 514 (Tex.1969).

Although a summary judgment may generally be based on the uncontroverted testimony of an interested party, the affidavits of interested witnesses in a "common law" or "actual" malice cause of action are not such readily controvertible proof of malice or lack of malice as will support a motion for summary judgment. *Bessent v. Times-Herald Printing Co.*, 709 S.W.2d 635, 636 (Tex.1986); *Beaumont Enterprise & Journal v. Smith*, 687 S.W.2d 729, 730 (Tex. 1985). In *Beaumont Enterprise*, the plaintiff sued the journal and its reporter, Linda Gilchriest, for libel. The court granted the defendant's motion for summary judgment. The Beaumont Court of Appeals held that there were fact issues presented, and reversed the judgment. The Texas Supreme Court stated that one of the issues for its review was whether the defendants met their burden of showing the absence of actual malice. The defendants in *Beaumont Enterprise* relied on Gilchriest's affidavit that she believed the article to be factually accurate and true. The Texas Supreme Court held:

> Texas Rule of Civil Procedure 166-A provides that a summary judgment may be based on the uncontroverted testimonial evidence of an interested party provided that the evidence is 'clear, positive, direct, otherwise credible ... and could have been readily controverted.' Gilchriest's affidavit as to her own state of mind is not evidence that could have been readily controverted; therefore it is not evidence that will support a summary judgment. *See Wise v. Dallas Southwest Media Corp.*, 596 S.W.2d 533, 535–536 (Tex.Civ.App.—Beaumont 1979, writ ref'd. n.r.e.); *see also Lewisville State Bank v. Blanton*, 525 S.W.2d 696 (Tex. 1975).

*Beaumont Enterprise & Journal*, 687 S.W.2d at 730.

As discussed above, the difference between "actual" malice and "common law" malice is that the former focuses on the truth of the statement, while the latter focuses on the motivation of the defendant.

Clearly, the proof required to demonstrate "common law" malice is *more* subjective and, therefore, less amenable to being "controverted" than is the evidence necessary to prove "actual" malice. Logic and policy suggest that the Texas Supreme Court's treatment of affidavit proof *by an interested witness* as to his lack of "actual" malice applies with even greater force to affidavit proof supporting an interested witness's assertion that he had no ill will or bad motive, i.e., no "common law" malice.

The appellant, although arguably not required to do so, presented evidence of the appellees' ill will towards him. This Court has held that malice may be "inferred from the relationship of the parties, the circumstances attending the publication, the language used, and from the words or acts of the defendant *before, at, or after the time of the communication....*" *Stearns*, 543 S.W.2d at 664 (emphasis added). Bryce, in his deposition, related an argument between himself and Little that occurred shortly after Fleming fired Little, as follows:

> And I told him I didn't cost him his job; his life-style cost him his job. And if you want it word for word, I told him if he'd keep dick out of his mouth, he wouldn't have that problem.

Bryce's statement, among others, is some evidence of his contempt for the appellant, thereby raising a fact issue regarding whether his publication of the defamatory statement was actuated by "common law" malice.

Further, there is a fact issue presented concerning the existence of "actual" malice. Little had earlier told Bryce that one doctor thought that Baxter *might* have AIDS, and that the doctor was going to run a test, but Bryce told his fellow employees that Little lived with an individual who *had* AIDS. Bryce also admits that his only information concerning Baxter came from Little, thus raising a fact question as to whether Bryce acted with knowledge of the falsity of his statement, or with reckless disregard of whether it was false, or at

least a "high degree of awareness of ... probable falsity." *Gertz*, 418 U.S. at 332, 94 S.Ct. at 3003. Bryce's statement was, in fact, false—neither Little nor Baxter had AIDS.

There are, accordingly, at least these additional questions of fact for a jury to resolve: Was the communication of Bryce a conditional privilege? Was it made with malice, as defined? Did Bryce's communication defame Little?

For the foregoing reasons, although concurring with the reversal, I would remand for trial on both the slander and wrongful termination issues.

Responding briefly to the final paragraphs in the majority opinion concerning the propriety of this concurring opinion, I would observe that the meaning of Rules 90(c) and (d) of the Rules of Appellate Procedure has apparently escaped the attention of the majority.

Rule 90(d) reads as follows:

Any justice may file an opinion concurring in or dissenting from the decision of the court of appeals. A concurring or dissenting opinion may be published if, *in the judgment of its author*, it meets one of the criteria established in paragraph (c), but in such event the majority opinion shall be published as well. (Emphasis added.)

Rule 90(c) states in pertinent part as follows:

An opinion by a court of appeals shall be published only if ... it is one that ... (2) involves a legal issue of continuing public interest; [or] (3) criticizes existing law....

The subject matter is not only of *continuing* public interest, it is one that will probably be of expanding, and even *intense*, public concern. And the majority's reaffirmation of a traditional opinion does not make that opinion any the less personal than the expression of newer legal concepts. Contrary to the majority's contentions, if the appellate rules did not contemplate the filing of opinions that criticize existing law, and that inherently and necessarily are expressions of personal views,

there obviously would be no need for Rule 90(c)(3), quoted above. Improvement and progress in the law must have their genesis in criticism of the existing order, imperfect though it may be in its origin.

I agree, of course, that the issues discussed in this opinion *would* best be determined after a full development of the evidence in a trial on the merits. But the narrow ground that the majority selected for reversal is precisely calculated to vitiate the "full development of the facts" that the majority says is pre-requisite before the issues may here be discussed. Such ingenious casuistry permits the appellees on remand merely to amend their answer and move again for summary judgment. Nothing in the majority opinion indicates to me that a simple amendment asserting a qualified privilege would not thereby entitle the appellees to prevail on a renewed motion for summary judgment, thus again foreclosing a trial on the merits and expressly bypassing any adjudication of the wrongful termination of employment issue.

This procedural snarl is not avoided, but rather made more impenetrable, by the majority's deliberate ignoring of the appellant's attempt through his points of error to have this Court give some guidance—at least in the name of judicial efficiency—on the issues that constitute his cause of action, issues that are of grave and increasing importance to contemporary society.